Petties v. Carter. May it please the Court, my name is Rami Fakhoury and I appear today on behalf of the appellant, Tyrone Petties, who is a inmate at Stateville Correctional Center. Our position on appeal today is simple. A jury should have had the opportunity to consider the numerous factual issues that were contained in the record below. There's no doubt that had Mr. Petties gone to trial below, he would have faced a strict burden of proof. But at the summary judgment stage, his burden was simply to show, with the benefit of all reasonable inferences, a fact issue on whether first, he had an objectively serious medical need, and second, whether the defendants, his treating physicians at Stateville, knew of a substantial risk of harm to him and disregarded that risk. The district court concluded that there was insufficient evidence only on the second subjective element of that test, and that ruling overlooked key evidence suggesting that the defendants failed to exercise medical judgment in critical respects when they treated Mr. Petties. The evidence the district court overlooked falls into three general categories. I'd like to just focus the court's attention with respect to each of those defendants on what that evidence is. First, there was a failure to follow treatment protocols. Second, there was a failure to follow the advice and treatment recommendations of a specialist who was outside the prison. And third, there was a refusal to provide treatment on non-medical grounds. Well, he was being treated even though they didn't do what you think he should have done. They did treat him throughout this period of time, right? That is correct. He certainly, Judge Caney, did receive treatment. The issue as we see it is that there was treatment that he was not given, that the district court overlooked, and that was called for both by protocols and by the recommendations of outside specialists. And as to that first point, the treatment protocols point, I would turn to Dr. Carter and just note that his failure to follow his own treatment protocol is something that other courts in the country have noted can create a genuine dispute of fact on the issue of deliberate indifference. As in terms of Wexford and what they had, they had written protocols, didn't they, on in terms of treating an Achilles tendon injury like he had? They did, Judge Williams, and that protocol was in the Wexford Policies and Procedures Manual. There was a specific manual called the Orthopedic Surgery Guidelines that appears at Record 82, and the specific guidelines for an Achilles rupture appear at page 16 of that document, which call for splinting or basically a mobilization of a ruptured Achilles tendon. Is there any difference between splinting and the boot? There is a difference. Both of those treatments provide a mobilization, but if you can picture a splint as sort of something that might not fully enclose the foot, whereas a boot is, you know, and certainly many people do and have had this injury. And Mr. Pettis did receive, as the record reflects, a boot, but he only received it six weeks after the fact, once he was treated by an outside specialist. The manual that I referenced, the treatment protocol, indicates that physicians at Wexford should incorporate those protocols into their daily practice, and there was evidence below that Dr. Carter knew this, because he testified at his deposition at Record 86-1 that he understood that part of his job was to treat splints. He also testified that he didn't remember a time when splints were unavailable in the prison. So this is a treatment that ostensibly could have been provided, but that simply wasn't provided at any point. And after that first visit with Carter, he didn't see a doctor for almost a month, and his Achilles tendon had shortened and was swollen? That's correct, Judge Williams. The first doctor he saw after that January appointment in the healthcare unit was in March 15th, I believe, of 2012. That was Dr. Pupala. And Dr. Pupala did, as you mentioned, note that there were two types of harm that were caused by the delay in immobilization. He noted both in his treatment notes, as well as in his testimony later, that there was a shortening of the tendon, in essence, the tendon pulling apart so that it wasn't healing properly. And there was also, of course, increased pain and needless suffering, which, as this court and others have held in cases like Smith versus Knox County, those are for a deliberate indifference claim. He was getting Vicodin, wasn't he? He was receiving pain medication, yes. And at that second visit with Carter, his ankle still was not immobilized? It was not immobilized until March, mid-March, correct. And so, the district court below did not consider all of this evidence. It agreed with the defendants that this was simply the product, the failure to immobilize, was simply the product of a difference of opinion among the doctors at Stateville. And certainly, a difference of opinion in an area where reasonable minds can differ might not rise to the level of deliberate indifference. But in this case, the record showed that none of the doctors thought immobilization was inappropriate. There was agreement between both Dr. Schmel at UIC, who testified that immobilization is essential, essentially, and gave reasons for that in detail. Dr. Pupala, obviously, at Hinsdale, was the doctor who immobilized the tendon, and he testified that he would always immobilize in case there was some secondary condition, like a sore, that would be interfered with by doing so. And finally, Dr. Carter himself testified in detail that immobilization is the proper treatment here. So, this isn't the case where Dr. Carter's actions comported with professional norms. In fact, they departed from his own knowledge of the appropriate treatment under the circumstances. And there's no evidence in the record, critically, I think, that this was the product of a medical judgment. So, in other words, Dr. Carter didn't look at Mr. Petty's and say, I could immobilize him, I couldn't, I have these reasons not to. He simply didn't provide the treatment, and there was no justification in the record. And we cited cases in our record about that. So, let me just make sure I have the timing right. So, he didn't get any type of immobilization device, be it splint or the boot, till six weeks after the injury? That is correct. He had a pair of crutches, he had pain medication, he had ice, but he did not have any kind of immobilization. And that is what, I think, alarmed Dr. Pupala when he noted in his walk on the injury. I would turn just briefly to Dr. Obasi, the second defendant who took over for Dr. Carter as medical director in July of 2012, which was about six months after the injury. And Dr. Obasi had refused to provide physical therapy that was ordered by an outside UIC specialist, again, without medical reason. And we cited cases like Arnett and Jones, indicating that the failure to follow the advice of a record here, there was no dispute that Dr. Schmell at UIC's treatment plan called for physical therapy twice a week, and Mr. Pettis never did receive that therapy. On this point, again, the district court credited the evidence of the defendants as to this issue over the evidence that we provided. The defendants said that Dr. Obasi, per his testimony, believed that Mr. Pettis could have simply provided his own physical therapy, sort of self-exercise in prison. That was an after-the-fact judgment made by Dr. Obasi during his deposition. There's no evidence in the record that Dr. Obasi considered that at the time, or that self-exercise was even discovered, discussed with Mr. Pettis. And it was also contrary to the testimony of Dr. Schmell, who was the treating specialist at UIC, and he testified that his intent in making that treatment order was to have Mr. Pettis receive treatment from a specialist, a physical therapist. I see I have a light, so unless there are further questions, I'll reserve. All right, thank you, Mr. Victoria. Mr. Larson. Good morning, and may it please the court, counsel. Robert Larson on behalf of the defendants. I think the logical starting point for our discussion here is the standard that's to be applied here. This is, of course, not a medical malpractice case, and even if the evidence were to arise to the level of malpractice, clear malpractice, that does not constitute deliberate indifference. The cases that counsel cited in his brief, if you look at those cases, they all involve far more serious injuries in situations where doctors or medical staff simply ignored the requests, or ignored the concerns of the prisoners. That's not the case here. This is a patient who received all kinds of different treatment. He was seen the very day of his injury, and Dr. Carter ordered an MRI the very day of the injury, and there's extensive treatment thereafter. So this six-week gap where there was nothing immobilizing it, neither splint nor boot, what's the explanation for that when that was in the Wexford protocol? Well, if you read the testimony of Dr. Carter, Dr. Carter considered the use of crutches to be immobilization. He said his biggest concern is that the inmate not place weight bearing on the injured limb, and to him that was an appropriate protocol. One may take issue with whether that was the case. One might even argue whether or not that's negligent, but it's clearly not deliberate indifference. But it was certainly the protocol by Wexford. Well, the term immobilization is not defined in the protocol, so it's not exactly clear, and certainly there's nothing in the protocol that defines time frames, nor does plaintiff cite the testimony of any doctor who says immobilization has to occur immediately or during X period of time, and a jury would not be equipped to make that decision if there's not medical testimony to suggest what the standard would have required. And if one looks at the standard, and I'm citing Collignon, C-O-L-L-I-G-N-O-N versus Milwaukee County, which is a case out of this circuit, a medical professional is entitled to deference and treatment decisions unless no minimally competent professional would have so responded under those circumstances. A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision the professional, by the departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment. Keep in mind that the doctor who originally prescribed the care for this inmate was neither of the defendants. It was Dr. Dubny. He's the one who prescribed the crutches, the pain medications, the patient, in addition to the other concerns for his pain, he was allowed to bed rest and have meals served to him in his cell. He was given other restrictions. He was, there were a number of treatments that were provided to him, so his concerns were not ignored. One may question whether or not the decision to allow crutches as immobilization was adequate, but that's an issue for medical judgment, not an issue for deliberate indifference. In fact, one of the cases that I find very compelling on this and addresses some of the same factual patterns is a case out of the Illinois Supreme Court, Estelle versus Gamble, 429 U.S. 97. I'll read a quote from it that I think is very instructive here. Gamble was seen by medical personnel on 17 occasions spanning a three-month period, and it lists the occasions. They treated his back injury, high blood pressure, and heart problems. Gamble was, has disclaimed any objection to the treatment provided for his high blood pressure and his heart problems. His complaint is based solely on the lack of diagnosis and inadequate treatment of his back injury. As we have here, the doctor's diagnosed his injury as a lower back strain and treated it with bed rest, muscle relaxants, and pain relievers. Respondent contends that more should have been done by way of diagnosis and treatment, and suggests a number of options that were not pursued. The Court of Appeals agreed, stating certainly an x-ray of the lower back might have been in order, and other tests conducted that would have led to appropriate diagnosis and treatment. But the Supreme Court says, but the question whether an x-ray or additional diagnostic techniques or forms of treatment is indicated as a classic example of a matter for medical judgment. A medical decision not to order an x-ray or like measures does not represent cruel and unusual punishment. At most it is medical malpractice. The Court of Appeals was in error in holding that the alleged insufficiency of the medical treatment required reversal and remand. That portion of the judgment should have been affirmed. Which case is that? That's Estelle versus Gamble, Your Honor, and I can give you the cite again if you'd like. Is it in your brief? Yeah, I didn't see. I was looking for it too. I don't see it in yours. I don't know that we cited it specifically in the brief, but certainly was cited in the record in the appellant's brief, and I'm taking that quote from the case. But he, of course, didn't emphasize the language that you just read to it. True. Looking though at that standard, and the purpose behind the standard, of course, which is we want prisoners to be treated fairly and humanely, but we don't want them to manipulate the process, and we want to prison system. So looking at the facts of this case, essentially Plamp has raised four arguments. The alleged delay in immobilizing the ankle for six weeks, the alleged delay in getting an MRI, the lack of surgery, and not having physical therapy. By the way, we didn't talk much about the surgery today, but the specialist, who supposedly was the person who should have made this decision all along, said he wasn't a candidate for surgery. So whatever may have been said and counsel says, based upon the claim of his client and no one else, that this decision was made purely for monetary reasons and not for medical reasons, that they refused surgery. In fact, the medical reason was that the specialist with special expertise in the issue of whether or not to treat this condition by surgery said this isn't a surgery case. So then he was on the crutches, but he had, and so he was just to make sure himself that the injured leg didn't bump into anything or anything happened to it. There was nothing, was there any gauze, was there anything that wrapped the ankle to protect it from further injury to keep it in place? No, he just had to hop on the crutches, right? Well, there was certainly no, there was no splint that was applied, and one can argue whether a freshly injured ankle that has swelling, a splint can sometimes cause what's referred to as compartment syndrome and things like that, but it was can have a splint or a boot. And part of what Dr. Carter's thought process was is let's get the MRI to find out exactly what we're dealing with. He ordered it the very same day that he, of the injury. He went and saw the patient, he ordered it right away, the first day. The problem was there were multiple lockdowns at the prison that prevented him from leaving to get the treatment that was ordered right away. That was certainly outside Dr. Carter's control. He has no ability to say, I don't care if there's a lockdown, I'm sending a were ignored. Again, one can question the medical judgment of whether or not crutches as opposed to or in addition to a splint were adequate, but that's not an issue of deliberate indifference. The care that was provided here, he was seen by specialists, he got an MRI, he received pain medication, he received modified orders, he received bed rest, he received instructions that he was allowed to walk slowly and not have to interact in the same way with other prisoners. There were a number of things that were done for him to control his pain and to help with his injury, and in fact his injury did heal without surgery and in the manner that was prescribed by the physicians that prescribed it. Let me ask you this, the time between the last lockdown and him actually getting the MRI, how much time lapsed? I don't remember the exact date, Your Honor, was I think a week or two. There was, it was late in January was the last of the lockdowns, I believe, and so then the MRI was actually, I think, received in March 6th and then he saw specialists a week or so thereafter is when he saw Dr. Pappala. Counselor, did you say he has recovered? The injury, even Dr. Schmel, the doctor at UIC identified in the second MRI that was performed on him that the injury was healing, which is why he said this is not a candidate for surgery. The treatment is working. Now, will he ever fully recover? One may not know that, but he had a right Achilles tendon injury. But at that time it progressed as they would have hoped, in other words, it was improving. Yes, Your Honor, and his prior injury to his other heel, as someone who suffers from Achilles tendon issues, it may never be 100% regardless of the treatment that's provided because his other heel was, there's no allegation that wasn't properly treated, and yet he complained that he was still suffering from problems related to that other tendon, which also relates to the issue of the physical therapy that was prescribed by Dr. Schmel and Dr. Obasi's decision not to send him for physical therapy. What Dr. Schmel actually said was that when asked about the physical therapy, he said, well initially the therapy would be done under the direction of the physical therapist and then ultimately on his own. So even he would recognize that the standard way the physical therapy is provided to a patient and then the patient is expected to follow up and do their own self-care. And so who taught him those exercises? We don't know exactly other than Dr. Obasi. Is there any evidence in the record that the doctor conveyed to him these are the exercises? So essentially the doctor gave him the exercises that the physical therapist would have. Is there any evidence in the record of that? I don't know that that was ever asked or directly discussed. The issue was that he had had a prior Achilles tendon injury and Dr. Obasi explained it was his custom and practice in that circumstance. He would assume the exact same exercises would have been addressed for the right versus the left and since he recovered he should have already known those things. So just to get out of prison time to go to a physical therapy session wasn't necessary. Again, one may question that decision-making but that's not deliberate indifference. So but specifically he was not given any direction on what exercises to use on this second injury? I don't. Nothing is in the records? There's nothing that specifically identifies that, that's correct. I believe my time is up unless anyone has any questions. Thank you, Mr. Larson. Thank you, Your Honor. Now why don't you address the interplay of the three times they were on lockdown so he couldn't go out to the MRI and how that affects your claim about immobilization? Certainly. So I believe the last lockdown, Judge Williams, occurred in early February, in about February 8th. So that was more than a month before the appointment at Dr. Paula's at Hinsdale Orthopedics. The other point I wanted to make about that is that the treatment order for those follow-up appointments was made back in January and it was made out for March and I believe that I don't have the record site right in front of me but there's a treatment order in which Dr. Carter signed it and indicated that would be made out for March. So the decision for that appointment to occur later was made from the very beginning. The other point I wanted to go back to, Judge Williams, was your point about the physical therapy. There was no indication in the record, as you intuited, that Dr. Obasi conveyed the instructions to Mr. Petty's and he actually testified to that fact at his deposition which is record 86-2, pages 63 and 95. Dr. Obasi said he had no recollection of discussing those points. A little more holistically, there is no dispute here about the legal standard. That was what we cited cases like Estelle for. We all know what the two-part test for deliberate indifference is. We all know that courts look at these issues for a totality of the evidence. The issue here was what was done below in terms of factual evidence and weighing of the evidence and we had a court below that did not give reasonable inferences to Mr. Petty's based on evidence. As to the issue of healing, for example, you heard counsel mention the MRI in September that showed signs of healing. That same MRI also showed that Mr. Petty's was suffering from what's called a tendinopathy and what Dr. Schmel later noted is a sign of tendon degeneration. So our position would be that even that MRI shows an issue of fact as to whether there was harm that was resulted to Mr. Petty's and we also have the evidence from an outside specialist, Dr. Kupala, who talked about the harm from the lack of immobilization. And so just to sum up, this isn't the case where the prison doctors were negligent or where reasonable minds could have differed about the treatment. On the issue of immobilization, you had no outside physician testifying that not immobilizing the tendon was the appropriate course of treatment. Mr. Petty's presented evidence to that effect that defendants that I denied him care that they knew he needed and that knew that he knew was called for both by treatment protocols as well as by the recommendations of outside physicians. As I mentioned before, there was evidence in the record from which a jury could find that defendants knowingly disregarded a risk of substantial harm and that Mr. Petty's in fact suffered harm. And so for those reasons, unless there's further questions... Just one question. Does the record indicate the background of Dr. Carter? The background in terms of training? Education and experience? There is evidence in the record and he testified that he has no expertise in Achilles tendon ruptures. He's not an orthopedic surgeon, for example. He testified that he I believe he's an internal medicine physician. He currently now works at a prison in Virginia, but he's a generalist and that was his undertaking. And Dr. Obasi testified, I believe, that he may not have treated an Achilles tendon rupture effort. So there was evidence that neither of them had specialization and in fact they testified that they would defer to specialists as to specialists judgment. So Obasi's background, he was a generalist, he was an internist. I believe so, Judge Williams. Thank you very much. Thank you, Mr. Tejari. Thanks to both counsel in this case. You were appointed in this case? We were appointed below the judge, yes. All right. We thank you for the representation in this case. The case is taken under advisement.